**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

SUMMIT LIFE OUTREACH CENTER
INC., a New York not-for-profit corporation;
and THE EVERGREEN ASSOCIATION,
INC., a New York not-for-profit corporation,
d/b/a EXPECTANT MOTHER CARE and
EMC FRONTLINE PREGNANCY
CENTERS,

                              JURY DEMANDED

                              Case No.:   1:24-cv-741

      Plaintiffs,

         v.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

      Defendant.
_____

**VERIFIED COMPLAINT FOR**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

     Plaintiffs Summit Life Outreach Center Inc. ("Summit") and The Evergreen Association,

Inc. d/b/a Expectant Mother Care and EMC Frontline Pregnancy Centers ("Evergreen"), by and

through the undersigned counsel herein complain of Defendant's violations of their First and

Fourteenth Amendment rights under the United States Constitution, respectfully showing the

Court as follows:

**INTRODUCTION**

    1.  Nearly 650,000 children—more than twice the population of Buffalo—were aborted

last year using a combination of the drugs mifepristone and misoprostol. *See* Rachel Jones &

Amy Friedrich-Karnik, Guttmacher Inst., *Medication Abortion Accounted for 63% of All U.S.*

*Abortions in 2023—An Increase from 53% in 2020* (Mar. 2024); *see* U.S. Census Bureau,

American Community Survey: Buffalo, New York (2022).

2.   When the FDA approved mifepristone for chemical abortion in 2000, the agency's pharmacological review noted that progesterone inhibits mifepristone's effects and thereby allows for "normal pregnancy and delivery." Mifeprex Drug Approval Package, *Pharmacology Review(s)*, U.S. Food & Drug Admin. pp. 16-17 (Sept. 28, 2000). That is, the FDA recognized that progesterone can neutralize mifepristone's effects.

3.   That theory was vindicated for the first known time six years later. A young woman named Ashley who dreamt of becoming a nurse unexpectedly became pregnant, whereupon her boyfriend emotionally coerced her into taking mifepristone by refusing to support the baby. But Ashley soon regretted her decision and, hoping to save her baby, asked Dr. Matthew Harrison, MD, for help. Grattan Brown & Matthew Harrison, *Undoing Mifepristone Abortion for the First Time* (Apr. 12, 2023); Crystal Kupper, *Reversal of Fortunes*, Daily Citizen (Sept. 18, 2015).

4.   Allowably using his professional medical judgment to administer a natural hormone that the FDA already had deemed safe for a treatment that the FDA had suggested might be effective, Harrison gave Ashley supplemental progesterone with her full knowledge and consent and told her not to take the second chemical abortion drug. A few days later the baby's heart was still visible on an ultrasound. A few months later Ashley delivered a healthy baby girl she named Kaylie and who now is a high school cheerleader with hopes and dreams of her own. *See* Testimony of Matthew Harrison, M.D. to Idaho Senate State Affairs Cmte. (Feb. 12, 2018).



*Figure 1. Ashley with daughter Kaylie, the first of an estimated 5,000 babies so far saved after their moms chose APR.*
*Source: Kim Hayes, First Doctor to Deliver a Baby Rescued from Abortion Pill Has a Heart for Life, Pregnancy Help News (Dec. 29, 2020).*

5.   Advances in obstetrics and gynecology frequently begin with such one-off reproductive choices made by a pregnant patient and her doctor and then expand to more formal case studies and case series if initial results look promising. That was what happened with mifepristone and other chemicals meant to start abortions before they were approved by the FDA and similar regulatory agencies abroad. *See* Ary A. Haspels, *Interruption of Early Pregnancy by an Anti-Progestational Compound, RU 486*, 20 Eur. J. Obstet. Gynec. Reprod. Biol. 169 (1985); B.H. Lim, et al, *Normal Development After Exposure to Mifepristone in Early Pregnancy,* 336 The Lancet 257, 257-58 (1990). And the use of progesterone to stop an ongoing abortion with progesterone followed a similar trajectory after Dr. Harrison's success in 2006.

6.   Every peer-reviewed case series completed since Harrison's 2006 success has confirmed the intuitive premise behind progesterone supplementation. If mifepristone starts a chemical abortion by *blocking* progesterone receptors, then abortion sometimes can be prevented before the embryo starves to death by *unblocking* those receptors. As the pro-choice director of Yale Medical School's reproductive health clinic once observed to *New York Magazine*, that premise makes such obvious "biological sense" that he would tell his own daughters to take progesterone if they hoped to reverse the effects of mifepristone. Ruth Graham, *A New Front in the War over Reproductive Rights: 'Abortion-Pill Reversal'*, N.Y. Times Mag. (July 18, 2017).

7.   But there is significant money to be made in chemical abortion, with Planned Parenthood charging on average $580 for dispensing the two-pill regimen—almost a week's pay for the median woman living in Buffalo. Planned Parenthood of Central and Western New York, Inc., Abortion Cost, https://www.raecanhelp.org/abortion-cost/; *see* U.S. Census Bureau, American Community Survey: Buffalo, New York, Earnings in the Past 12 Months (2022).

8.   Seeking to maximize profits, New York abortion clinics hide known medical risks of chemical abortion from their patients, including life-threatening hemorrhaging, while lying to the public by contending that APR is untested, unsafe, and ineffective. *E.g.*, Planned Parenthood of Greater New York, *Ask the Experts: Can the Abortion Pill Be Reversed After You Have Taken It?*, (Sept. 14, 2017), https://perma.cc/6Z2D-5EJD.

9.   Defendant Letitia James received more than $10,000 in campaign contributions from Planned Parenthood during her successful run for Attorney General, and subsequently she has not hesitated to shill for Planned Parenthood's disinformation campaign against APR and pro-life organizations in general. *See* New York State Board of Elections, Public Reporting System: Contributions by Recipient, https://tinyurl.com/4e328rk2. For example, without and contrary to readily accessible evidence, James has parroted the abortion industry's characterization of pregnancy centers as "fake clinics" that "confuse patients, trick them into visiting, and shame patients into not getting an abortion." Planned Parenthood of Central & Western New York, Ask Rae: Abortion FAQs – General Abortion Questions, https://www.raecanhelp.org/faq/; *see* Planned Parenthood, *What Are Crisis Pregnancy Centers?* (Nov. 4, 2021) ("fake clinics"); NARAL Pro-Choice America, *Crisis Pregnancy Centers Lie* 2 (2015) ("fake clinics"); Letitia James, *How New York Protects Your Right to Reproductive Health Care*, https://perma.cc/2EZ3-8NPZ (cribbing abortion lobby characterization as to "fake abortion clinics").

10. James has for years blustered in favor of abortion with a vengeance. She even bullied Google into hiding pro-life organizations from Google Maps and confederated with other blue-state attorneys general to abet Yelp in misleading the public about what services the organizations offer. *See* Letter from Letitia James to Halimah DeLaine Prado, Google General Counsel (June 28, 2022); Rob Bonta, et al., Open Letter from Attorneys General Regarding CPC Misinformation and Harm (Oct. 23, 2023). She has bullied at least eight sister states on her official social media account and engaged in frivolous lawfare against them when they enacted abortion policies she dislikes. *See* NY AG James, Twitter.com (May 3, 2022) (bragging about the interference); *id.* (Aug. 16, 2022) (adding eighth state); *see also* Brief for New York, et al. as Amici Curiae Supporting Petitioners, FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024), No. 23-236; Brief for California, New York, et al. as Amici Curiae Supporting Respondent, Moyle v. United States, 2024 LEXIS 2849 (June 27, 2024), No. 23-726. And she has repeatedly lied online and in state publications about the science behind APR. *E.g.*, NY AG James, Twitter.com (May 3, 2022), https://perma.cc/P6VE-3WQK.

11. Government officials trying to suppress speech they disfavor often eventually move from demagogic propaganda and lies to outright attempts to silence critics under color of law. *See* Martin Luther King, Jr., *Letter from Birmingham Jail* (1963); Hannah Arendt, *The Origins of Totalitarianism* 341-44 (1951). So too here: because bullying and blustering failed to silence APR-promoting speech in New York, in April James sought to conscript the courts into her unconstitutional scheme.

12. In a blitz attack that month, James mailed boilerplate notices-of-intention-to-sue (NOIs) to eleven New York-based pregnancy help organizations (PHOs) and the nonprofit operator of the national Abortion Pill Reversal Network. The NOIs alleged (without evidence)

that recipients' truthful noncommercial statements about APR constituted commercial fraud under two state statutes. And James threatened to harass the recipients with suits under those inapplicable statutes unless they promptly showed how pro-APR statements she did not identify were not misleading. **(Exhibit A.)**

13. Tellingly, James sought not to restrict the practice of APR itself, which, because it is perfectly safe, remains entirely legal under U.S. and New York law. She threatened only to silence disfavored actors who *speak* about this utterly lawful practice—triggering a veritable First Amendment crisis across "the Empire State."

14. The NOI recipients refused to be bullied and sued James in the Supreme Court of Monroe County, asking that court for declaratory and injunctive relief to halt her campaign to suppress their speech about the science of APR on account of its content and viewpoint.

15. James then filed her threatened suit against the NOI recipients a week later in a New York County Supreme Court, a venue which had zero connection to her targets but instead would be the most expensive and inconvenient venue for these small nonprofits to defend their rights. James tried to gaslight the justices in Monroe County and New York County into declaring her later-filed suit to be first-filed for venue purposes, but those courts were not beguiled, and the cases were consolidated in Monroe County. True to form, James has appealed that well-bottomed decision, in a bid to continue blatant forum shopping for her frivolous anti-free speech litigation.

16. Plaintiffs in this action, pro-life organizations whose mission is informed by their religious conviction that abortion is the killing of an innocent human being, are not parties to that state court suit. But James' years-long campaign of intimidation against pro-lifers creates considerable "risk of catastrophic harm" that Plaintiffs could soon suffer if (and highly likely when) they are targeted by similar lawfare over their own similar pro-APR communications. *See*

*Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). Plaintiffs indeed already are being harmed because the litigative sword of Damocles that hangs above their heads has chilled their speech and forced them to discontinue communicating the science of APR.

17. Plaintiffs thus are compelled to file this suit to defend their rights to free speech, free exercise of religion, and due process under the First and Fourteenth Amendments. They seek declaratory and injunctive relief, and other such relief as the Court may deem just and equitable, so they can continue speaking about APR and refocus their attention on women in need.

## JURISDICTION AND VENUE

18. The Court has jurisdiction over this suit both because it raises a federal question under the First and Fourteen Amendments to the United States Constitution and because it raises a federal question under a federal statute—the Civil Rights Act of 1871. 42 U.S.C. § 1983.

19. The Court has subject matter jurisdiction over the Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343.

20. The Court may issue the declaratory relief Plaintiffs request under 28 U.S.C §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

21. The Court may issue the injunctive relief Plaintiffs request under 28 U.S.C. § 1343 and Rule 65 of the Federal Rules of Civil Procedure.

22. The Court may award Plaintiffs reasonable attorneys' fees and costs in this civil rights suit under 42 U.S.C. § 1988.

23. Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391 because Plaintiffs reside in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Defendant James maintains regional offices in this district.

## THE PARTIES

24. Plaintiff Summit is a 501(c)(3) tax-exempt organization located in Niagara Falls, New York, that aims to speak the truth in love and to empower women to choose life by providing free pregnancy and childcare services and the hope of Christ to women and men experiencing an unplanned or unintended pregnancy.

25. Thanks to the generosity of local churches and donors, Summit offers pregnancy and childcare resources including pregnancy tests; ultrasounds; peer counseling; parenting classes; material items such as diapers, baby clothes, and strollers; and connections to other organizations that provide financial support and medical care the center cannot provide. Summit Life Center Inc., Free Services, https://summitlifecenter.com/free-services; Rachel Stevens, *Baby Shower Supports Summit Life Center*, Niagara County Tribune-Sentinel 5 (Feb. 9, 2024).

26. Summit does not charge or receive reimbursement for any service it offers.

27. Summit maintains a website and Facebook page to inform the local community about the free services it provides, many of which the women and men of Niagara Falls otherwise could not obtain at all or would need to pay for. *See, e.g.,* Planned Parenthood of Central and Western New York, Inc., Niagara Falls Office, Insurance and Payments, https://perma.cc/B43H-VVLV (offering fewer services and requiring upfront payment for some services regardless of a patient's ability to pay).

28. Summit pulls in just over $100,000 a year in total revenue from donations, fundraising events, and modest investment income. *See* Summit Life Outreach Center: IRS Form 990, at 1 (2023), https://perma.cc/4HAK-RJ9S.

29. Because Defendant James filed a meritless suit against other not-for-profit pregnancy help centers in New York claiming that they deceive and mislead the public when they share

scientific evidence that shows APR to be safe and effective, Summit fears that James might also target it with a meritless suit if Summit shares scientific evidence about APR.

30. Summit therefore does not communicate to the community and potential clients the substantive information about the scientific evidence supporting the safety and efficacy of abortion pill reversal ("APR"), instead merely including a bare link to Abortionpillreversal.com on its website and refraining entirely from discussion of APR on its Facebook page.

31. Summit would immediately begin to provide information to the public about the science, safety, and effectiveness of APR in the absence of James' meritless suit, but it is being chilled from doing so because of a fear of ruinously expensive lawfare against it by James, a vocal abortion advocate who has made no attempts to hide her deeply entrenched animus to pregnancy help centers.

32. That chill is impairing Summit's ability to fulfill its religiously motivated mission of giving local women who wish to give birth the information and resources they need and oftentimes cannot secure from any other source.

33. Evergreen is a 501(c)(3) tax-exempt organization that believes that the Bible teaches that every human life is sacred, and that no woman should feel forced to have an abortion because of a lack of financial or emotional support.

34. Evergreen therefore for nearly four decades has offered local women pregnancy resources including pregnancy tests, education about their reproductive options, assistance in finding prenatal care and adoption services, shelter, legal aid, and hundreds of thousands of diapers. *See* The Evergreen Association: IRS Form 990, at 2 (Mar. 24, 2024); *Group Hopes to Deliver 1M Diapers Across Tri-State*, News 12 Westchester (Apr. 23, 2020).

35. Evergreen does not charge or receive reimbursement for any service it offers.

36. Evergreen made online statements about the science of APR until late April 2024, *e.g.*, Expectant Mother Care-EMC FrontLine Pregnancy Centers, Facebook.com (Apr. 22, 2024), when it became aware of James' NOIs against similarly situated pro-life organizations on account of their own similar statements. *Id.* (Apr. 26, 2024).

37. Evergreen has since refrained from making any further statements about the safety or effectiveness of APR, given the meritless case James filed against those NOI recipients, fearing that James could abuse the power of her office to target them for lawfare. But for the threat of enforcement of General Business Law §§ 349 and 350 against it, Evergreen would immediately resume its communications about the science, safety, and effectiveness of APR.

38. That chill is impairing Evergreen's ability to fulfill its religiously motivated mission of giving local women who wish to give birth the information and resources they need and oftentimes cannot secure from any other source.

### DEFENDANT JAMES' RETALIATORY ANIMUS

39. Defendant James long has disregarded her duty under the state constitution to be a neutral legal officer who does not intrude into matters of public interest that belong in the marketplace of ideas, not the courts. Her advocacy has been diverse but consistent and unapologetic. She has led abortion marches and grandstanded at a rally for chemical abortion on the steps of the U.S. Supreme Court, stumped to enshrine abortion in the state constitution, and pushed to force taxpayers to pay to hire new staff and renovate abortion clinics and to subsidize violations of sister States' abortion laws. *See* N.Y.S. Bill No. 10148-A (May 4, 2022); Deanna Paul, *New York Attorney General Pushes for State Abortion Fund,* Wall St. J. (May 9, 2022); Grace Ashford, *New York Lawmakers Push for Abortion Fund to Establish 'Safe Harbor',* N.Y. Times (May 9, 2022); NY AG James, Twitter.com (Mar. 26, 2024).

40. Her attacks in official publications and on social media—the "modern public square"—target anyone she deems insufficiently zealous in promoting abortion. *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Those attacks have occurred most prominently on the social media platform X (previously known as Twitter), which is a main source of news about public issues for most of its users, especially those of normal childbearing age. *See* Elisa Shearer, et al., Pew Research Center, *How Americans Get News on TikTok, X, Facebook and Instagram* (June 12, 2024); Pew Research Center, *Social Media and News Platform Fact Sheet* (Nov. 15, 2023).

41. She used her official government Twitter account to bully national pharmacy chains into providing chemical abortion drugs, Google into hiding PHOs from Google Maps, and Yelp into attaching false warnings about those organizations. *See, e.g.*, NY AG James, Twitter.com (May 3, 2022); *id.* (Mar. 9, 2023); *id.* (Aug. 25, 2022). And she repeatedly has lied on Twitter and in official government publications that PHOs are "fake clinics" that deviously try to deceive the women they provide free services to.

42. None of James' statements on Twitter about APR or pro-life organizations contains any link to any peer-reviewed clinical trials to support any of her misleading claims. While James has no formal medical training, nor even a manifest grasp of basic medical facts, she nonetheless sets herself up as an oracle of scientific truth. She has tweeted at least 16 times in her official capacity that New Yorkers should adhere to her view of "science" and fight against attempts to undermine it, and to demean politicians and judges she personally believes ignore her notion of "science" when it conflicts with her policy views. NY AG James, https://perma.cc/P6VE-3WQK.

43. Despite James' relentless politicking and demagogic tantrums, the number of PHOs

in New York continues to grow. *See* Kimiko de Freytas-Tamura, *Anti-Abortion Centers Prepare for a Post-Roe World*, N.Y. Times, at L1 (June 25, 2022). Not content with her improper role as a quasi-politician advancing her militantly pro-abortion personal views through strident partisan advocacy and political pressure campaigns, which have failed to produce the result she desires, James has now resorted to lawfare and related intimidatory abuses of power.

44. James' lawfare has been broad and self-evidently meritless. It includes participating in suits against at least eight other states that have chosen pro-life policies she dislikes. *See* NY AG James, Twitter.com (May 3, 2022) (bragging about the interference); *id.* (Aug. 16, 2022) (adding eighth state). And it further included leading a coalition of state attorneys general urging the U.S. Supreme Court to reverse a district court ruling restricting use of mifepristone to its originally authorized, on-label use. *See* Brief for New York, et al. as Amici Curiae Supporting Petitioners, FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024), No. 23-236.

45. But even this has not been enough for James. As noted above, seeking to deprive women of reproductive choices she disfavors, she has sued numerous pro-life PHOs in state court last month on the novel theory that their truthful noncommercial speech about APR is business fraud. James hopes her battalion of taxpayer-funded lawyers will make it so costly for these small nonprofits to defend their constitutional rights that they eventually settle—which would automatically subject them to a gag order under the applicable under state law.

46. Continuing with her demagogic propaganda, in just the month after she filed her state suit, James posted at least six times to her official government Twitter account to spread yet more disinformation about APR or to brag about forcing those with religious objections to abortion to pay for it through their insurance. NY AG James, Twitter.com (May 21, 2024); *id.* (May 11, 2024); *id.* (May 6, 2024) (four separate times in a daylong tweetstorm).

## DEFENDANT JAMES' VIEWPOINT DISCRIMINATION

47. The science is clear: APR is safe and effective, whereas the chemical abortion drugs cause such serious complications, and with such frequency, that the FDA requires the first drug to carry the agency's gravest danger warning. Yet even though James so far has sued a dozen pro-life organizations for communicating scientific evidence supporting APR safety and effectiveness—while tellingly not challenging the lawfulness of APR itself—she has not sued a single pro-abortion organization for hiding information about the dangers of chemical abortion or spreading disinformation about APR.

48. Attempts to hide the danger of profitable chemical abortions are rampant and ongoing in New York. For instance, Planned Parenthood of Greater New York (PPNY) assures the public on its website that chemical abortion is "very safe and effective," never mentioning that the FDA estimates that chemical abortions have caused more than 4,000 women to suffer serious adverse medical events, including hemorrhage, septic shock, ruptured ectopic pregnancies, and at least 28 deaths. Susan Jaffe, *Drug Developers Caution Against US Mifepristone Ban*, 401 The Lancet 132526 (2023).

49. Nor does PPNY disclose that women who undergo a chemical abortion are almost four times as likely to require emergency hospitalization than they would be if they had a surgical abortion. *See* Maarit Niinimaki, et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 Obstet. Gynecol. 795, 795 (2009).

50. As to APR, PPNY knowingly and deliberately misleads the public with a false claim that APR has never "been tested for safety, effectiveness, or the likelihood of side effects." Emily, *Ask the Experts: Can the Abortion Pill Be Reversed After You Have Taken It?*, (Sept. 14, 2017), https://perma.cc/6Z2D-5EJD.

51. But APR has undergone scientific testing for *decades*. The research has been published in numerous peer-reviewed medical journals. And those studies without exception have found APR to be safe, effective, and associated with no serious side effects. *See, e.g.*, George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues in L. & Med. 21, 21-31 (Spring 2018). In other words, PPNY blatantly lies to the public about a medical procedure that cuts into its revenues. APR remains legal under New York law, and James does not contend otherwise.

52. James has never sued PPNY or any other abortion provider for commercial fraud under GBL §§ 349 and 350 despite their material omissions and outright lies about services they sell.

53. In contrast, ignoring all scientific evidence to the contrary, James has sued many pro-life PHOs under commercial fraud statutes for truthful communications about a service they provide for free. *See* Gian Carlo De Renzo, et al., *Progesterone: History, Facts, and Artifacts*, 69 Best Pract. & Res. Clinical Obstetrics & Gynecology 78 (2020); "Drug Approval Package," Prometrium (Progesterone) Capsules, Application No. 020843, FDA (approved Dec. 26, 1998); FDA, Center for Drug Evaluation and Research, Application No. NDA 2-843, at 4 (Feb. 25, 1998).

54. The APR protocol is a legitimate reproductive health procedure, fully legal in New York, the advocacy and promotion of which are protected by the First Amendment as a matter of public concern. James has no right to interfere with this quintessentially protected speech by attempts to impose, through lawfare or otherwise, her preferred perspective in favor of abortion-on-demand or her view of what constitutes valid "medical science."

## FACTUAL BACKGROUND

55. As noted above, the sole ground for James' legal action against similarly situated pro-life organizations in state court is the claim that they have made false statements and omissions regarding APR. Science clearly shows that accusation to be baseless and pretextual.

### *Chemical Abortion*

56. When a woman becomes pregnant, her body begins to secrete progesterone to among other things establish a nutritional pipeline to the developing embryo. *See* Dominique L. Cope & Diana Monsivaid, *Progesterone Receptor Signaling in the Uterus Is Essential for Pregnancy Success*, 11 Cells 1474 (2022); *see generally* Cleveland Clinic, *Progesterone* (Dec. 29, 2022).

57. Progesterone supplementation is approved by the FDA and has been commonly used worldwide for seven decades to safely help prevent miscarriage when a woman's natural progesterone levels are too low. *See* Omar Mansour, et al., *Prescription Medication Use During Pregnancy in the United States from 2011 to 2020: Trends and Safety Evidence,* Am. J. of Obstet. & Gynec. (in press) (published online Dec. 19, 2023), https://tinyurl.com/5bep25c3; A.I. Csapo & A. Pinto-Dantas, *The Effect of Progesterone on the Human Uterus*, 54 Proc. of the Nat'l Acad. of Scis. 1069 (1965).

58. A chemical abortion occurs over a period of days using two drugs. The first drug is mifepristone, a chemical with such dangerous known side effects that the FDA requires it to be labeled with a black box—its gravest danger warning. *See* Nat'l Libr. of Med., *Drug Label Information: Mifepristone Tablet,* https://tinyurl.com/kzn66wvf (Mar. 30, 2023). The second drug is misoprostol, which the FDA never has approved for inducing abortions, but which abortionists use off-label for that purpose.

59. Mifepristone acts quickly but kills slowly. Soon after it is administered, it locks onto

a woman's progesterone receptors and thereby tricks her body into not producing progesterone needed to make the womb hospitable for life. Most devastatingly, it cuts off nutrition to the developing embryo, slowly starving her over a period of days before it decays enough to detach from the receptors and allow her mother's body to restore its normal hormonal balance. Daniel Grossman, et al., *Continuing Pregnancy After Mifepristone and Reversal of First-Trimester Medical Abortion*, 92 Contraception 206, 210 (2015).

60. Because a few days without sustenance are not enough to kill all children in gestation (especially older ones), a woman is instructed to take misoprostol at home a few days after mifepristone to induce uterine contractions that will expel the developing child whether or not she is still alive. All told, the two drugs combined are about 97 percent effective in completing an abortion, though chemical abortion is about four times more dangerous than surgical abortions and sends thousands of women to the emergency room with complications each year. *See* Maarit Niinimaki, et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 Obstet. Gynecol. 795, 795 (2009).

61. When the FDA approved mifepristone for use in chemical abortions, it concluded after a pharmacological review that mifepristone's ability to work as an abortifacient "is antagonized by progesterone allowing for normal pregnancy and delivery." Mifeprex Drug Approval Package, *Pharmacology Review(s)*, U.S. Food & Drug Admin. pp. 16-17 (Sept. 28, 2000). That is to say, the FDA recognized that progesterone reverses the effects of mifepristone.

### Abortion Pill Reversal

62. The first known attempt to reverse the effects of mifepristone using progesterone in such a way occurred in 2006. In that year, Dr. Matthew Harrison, MD, was approached by a woman who had taken mifepristone and wanted to reverse the effects of it. He treated her with

progesterone, and she went on to deliver a healthy baby girl.

63. Even the only scholar on whose research James relies in her state-court suit acknowledges that use of progesterone during pregnancy is safe. Mitchell D. Creinin & Melissa J. Chen, *Mifepristone Antagonization Requires Real Studies to Evaluate Safety and Efficacy*, 100 Contraception 427, 429 (2019).

64. Based on his own experience, Dr. George Delgado, MD, soon thereafter devised the APR protocol for reversing the effects of mifepristone; began to advise other doctors on APR; and set up a website and hotline to connect women who seek to reverse the effects of mifepristone with licensed medical professionals—which became known as the APR Network.

65. The basic biochemical premise of APR is straightforward: the effect of mifepristone—which unnaturally blocks a pregnant woman's progesterone receptors—can be reversed by supplementing progesterone to overwhelm the mifepristone, thereby unblocking the receptors, and reestablishing nutrition to the embryo that the mifepristone is causing to be starved to death. *See* John W. Pelley, *Elsevier's Integrated Review Biochemistry* 33-34 (2d ed. 2011).

66. Decades of scientific studies beyond the FDA's findings from its pharmacological review of mifepristone have provided concrete evidence to support that biochemical premise. *E.g.*, S. Yamabe, et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 Nihon Naibunpi Gakkai Zasshi 497 (1989). The most recent such study—a clinical animal trial that used rats because of rats' similar biochemical responses to humans—published in a peer-reviewed journal last year found that administering progesterone after mifepristone saved more than four out of every five pregnancies. *See* Christina Camilleri & Stephen Sammut, *Progesterone-Mediated Reversal of Mifepristone-Induced Pregnancy Termination in a Rat Model: An Exploratory Investigation*, 12 Sci. Rep. 10942 (2023).

67. James' "science" is based entirely on a single study authored by an abortion provider who is a paid consultant for the company that manufactures mifepristone. Even more ridiculous, the FDA had previously investigated this "scientist" for conducting unethical research on subjects without informed consent. *See* Mitchell D. Creinin, MD, et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion*, 135 Obstet. & Gynec. 158 (2020); FDA, Warning Letter to Mitchell D. Creinin, MD (June 12, 2002). But even this fatally compromised, partisan "researcher" has questioned whether it is possible to complete an APR clinical trial on women who wanted to save their pregnancies. *See* Mitchell Creinin, *A Randomized Trial of Mifepristone Antagonization with High-Dose Progesterone to Prevent Medical Abortion: Study Protocol and Statistical Analysis Plan* 5 (July 18, 2019), https://perma.cc/DKP8-RSXY.

68. The second-best form of scientific research after clinical trials is case series that observe how patients react to treatments. Those studies show *without exception* that APR is both safe and effective at saving some pregnancies, if begun within a few days of a woman taking or being given mifepristone. *See* George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21 (2018); Deborah Garratt & Joseph V. Turner, *Progesterone for Preventing Pregnancy Termination After Initiation of Medical Abortion with Mifepristone*, 22 Eur. J. Contracept. Reprod. Health Care 472 (2017); George Delgado & Mary L. Davenport, *Progesterone Use to Reverse the Effects of Mifepristone*, 46(12) Ann. Pharmacother. e36 (2012).

69. The unequivocal outcomes of such case series resulted in a scoping review of the APR scientific literature—written by an author who had not participated in the previous research—to conclude last year that there is "*no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy*," and that "mifepristone antagonization with progesterone is a

*safe and effective treatment*." Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90(4) Linacr. Q. 395 (2023) (emphasis added).

70. Such case series frequently are relied on to support peer-reviewed research in obstetrics and gynecology. For example, the Science Direct database collects more than 350 research articles from two leading journals—the *American Journal of Obstetrics and Gynecology* and the *European Journal of Obstetrics & Gynecology and Reproductive Biology*—that rely on case series rather than clinical trials. *See* **Exhibit B** (Boolean search of research articles published 2000-2024 of "case series" NOT "clinical trial" NOT "trial" yielding 184 and 174 articles in each journal, respectively).

71. Case series also regularly are relied on for conclusions about the safety and effectiveness of mifepristone and misoprostol, including studies paid for by its manufacturer. *E.g.*, Leah Esposito, et al., *Mifepristone-Misoprostol Combination Treatment for Early Pregnancy Loss After Embryo Transfer: A Case Series*, 4 F & S Reports 93 (Mar. 2023); Jillian T. Henderson, et al., *Safety of Mifepristone Abortions in Clinical Use*, 72 Contraception 175, 175 (2005).

72. The American College of Obstetricians and Gynecologists ("ACOG"), for its part, repeatedly and recently has relied on case series in its committee opinions and practice bulletins when clinical trials would be difficult or unethical. *E.g.*, ACOG, Clinical Practice Guideline No. 8 (Jan. 2024); ACOG, Committee Opinion No. 682 (reaffirmed 2023); ACOG, Committee Opinion No. 614 (reaffirmed 2023); ACOG, Practice Bulletin No. 225 (reaffirmed 2023); ACOG, Obstetric Care Consensus No. 7 (reaffirmed 2021).

73. Considering (a) the above studies; (b) over a decade of widespread successful use of APR by licensed healthcare professionals, and (c) the irrefutable evidence of its biochemistry, APR has been endorsed by the American Association of Pro-Life Obstetricians & Gynecologists,

with more than 7,000 members; the Catholic Medical Association; and Canadian Physicians for
Life, among others. *See, e.g.*, Am. Ass'n. of Pro-Life Obstetricians & Gynecologists, 2019
AAPLOG Position Statement on Abortion Pill Reversal, https://perma.cc/6RRC-GE2K.

74.  In sum, the actual science reveals James' amateur-hour lawfare to be the essence of
an *anti-scientific* crusade based on a secular superstition and antipathy to the pro-life cause.

### Plaintiffs' Intended Communications About APR

75.  As noted above, Plaintiff Evergreen in the past communicated truthful information
about APR to the public via Facebook and a link on its website (to the website of CompassCare,
a Rochester-based PHO James sued in her state case). Those communications shared the
scientifically supported view that APR sometimes can safely reverse the effects of mifepristone
before a chemical abortion has gone to completion.

76. Plaintiff Evergreen wishes to continue endorsing APR in its public communications
on social media including Facebook but has dared to do so only once since James' April anti-
science legal campaign. And even then only in a glancing fashion, using stilted scientific terms
likely to be unfamiliar to many persons seeking reproductive care. *See* Expectant Mother Care-
EMC FrontLine Pregnancy Centers, Facebook.com (May 17, 2024).

77.  Plaintiffs Summit and Evergreen both wish to link their respective websites to
scientific studies supporting APR on other websites, but they dare not do so because James' state-
court filings show that she rejects that science and in fact sued others in her state suit precisely
*because* they faithfully represented the favorable science evidence reported in those studies.

78. The United States Constitution protects Plaintiffs' statements regarding APR under
the Free Speech and Free Exercise Clauses of the First Amendment and the Due Process Clause
of the Fourteenth Amendment.

79. Moreover, the statements Plaintiffs wish to make regarding APR are in conformity with the advertising requirements of the Federal Trade Commission (FTC), which would be a complete defense to James' unsupported claim under both General Business Law § 349 and General Business Law § 350-d, both of which are invoked in James' suit against similarly situated New York-based PHOs.

80. Unlike Planned Parenthood of Greater New York and other New York abortion providers, Plaintiffs have never communicated any objectively false or misleading statement about APR or any other abortion procedure.

81. James, on the other hand, has no legal authority to pronounce on the scientific merits of APR or to demand conformity to her view of what Plaintiffs or anyone else should say about it.

82. James has wantonly and ruthlessly prosecuted under commercial fraud statutes the truthful noncommercial speech of pro-life organizations that provide free services to women in need, while herself repeating the abortion industry's lies about profitable chemical abortions, concerning which she does nothing, but on the contrary promotes their lies. This situation makes it clear that the constitutionality and truthfulness of the statements that Plaintiffs wish to make would not be safeguards against a vexatious and potentially financially ruinous suit like those James has filed against her other lawfare targets.

83. Further, James continues to vigorously prosecute her state case and saddle that case's defendants with the burdens of her frivolous litigation, even though none of her filings in that case (or the case that recently was consolidated with it) provides *any* evidence of *any* misleading statement or omission by *any* party she sued or that *any* consumer has *ever* been injured, relied on, or suffered loss because of a sued party's noncommercial APR communications.

84. This threat has already chilled and will continue to chill and suppress Plaintiffs' exercise of their federal constitutional rights, and it imminently threatens to cripple or destroy their operations via damages, civil penalties, and "auditing and compliance review." In other words, it would lead to continuous government meddling by James and her subordinates in Plaintiffs' religiously motivated, scientifically accurate, and First Amendment-protected speech and expressive association.

85. Plaintiffs thus move the Court for declaratory and injunctive relief as specified below.

### NEW YORK EXECUTIVE LAW § 63(12) AND
### NEW YORK GENERAL BUSINESS LAW §§ 340 AND 350

86.   Most state prosecutions in New York are entrusted to local county and district attorneys, but Section 63(12) of the New York Executive Law carves out a narrow exception to that rule that authorizes James to bring an action against "any person" who engages in "repeated fraudulent or illegal acts or otherwise demonstrate[s] persistent fraud or illegality in the carrying on, conducting or transaction of business."

87.   Section 349 of the GBL outlaws all "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state" and gives James unbridled discretion to sue any business she "believe[s] from evidence satisfactory to [her] … has engaged in or is about to engage in" any of those acts. GBL § 349(a)-(b).

88.   Section 350 of the GBL provides: "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

89.   Executive Law § 63(12) and GBL §§ 349 and 350 are hopelessly vague. They do not define key terms that would provide New Yorkers of average intelligence necessary information to know what acts and practices in the conduct of their business, trade, or commerce are unlawful. And the sections impermissibly give James unbridled discretion to file a legal action against any

entity *she* believes has made a deceptive or materially misleading statement based solely on *her* uninformed, partisan opinion on a matter of public interest: the reproductive choice of women who choose to attempt to save their children from certain death by the chemical abortion they started but immediately came to regret—after Planned Parenthood had been paid, of course.

## **FIRST CAUSE OF ACTION**

(Violation of Plaintiffs' Freedom of Speech and Expressive Association)

90.    The preceding allegations are incorporated here by reference.

91.    The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

92.    James' baseless and intrusive state court suit against pro-life organizations across New York for alleged commercial fraud based on their truthful noncommercial statements about APR—in which she seeks "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper"—has already chilled, and will chill, Plaintiffs' protected pro-life speech and expressive association. Unless enjoined, it will result in censorship of that speech and interference with that expressive association, imminently inflicting irreparable harm absent injunctive relief.

93.    In the absence of injunctive relief, Plaintiffs will imminently suffer irreparable harm from James' retaliatory and viewpoint-discriminatory enforcement of the laws in violation of the First Amendment because of Plaintiffs' inability to communicate information about the safety and effectiveness of APR directly to the general public or indirectly by linking its website to scientific studies supporting the safety and effectiveness of APR.

94.     Plaintiffs are thus entitled to both (1) a declaratory judgment that James' ongoing and imminent *in terrorem* campaign against New York-based pro-life organizations—including themselves—violates the First Amendment and (2) appropriate temporary, preliminary, and final injunctive relief against James filing vexatious suits against Plaintiffs under inapplicable GBL §§ 349 and 350 for substantively similar communications about the safety and effectiveness of APR.

95.     Plaintiffs' right to freedom of speech and expressive association under the First Amendment as applied to the States via the Fourteenth Amendment, and is thus redressable under 42 U.S.C. § 1983, with Plaintiffs entitled to an award of costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

96.     James has no evidence that any pro-life organization in New York, including Plaintiffs, has ever made any "misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol" or any evidence that any Plaintiff has made misleading "statements and omissions relating to the safety and efficacy of the APR protocol."

97.     James' view of what constitutes a "misleading" statement or omission regarding APR is nothing but her opinion, and James has no competence or authority to dictate what constitutes valid medical opinion and practice regarding APR.

98.     James' evident attempt to impose an official narrative against APR flatly contradicts the teaching of the United States Supreme Court in *National Institute of Family & Life Advocates (NIFLA) v. Becerra,* 585 U.S. 755 (2018), which holds that the state has no competence or authority under the First Amendment to impose on private parties, in the name of "science," the government's side of a First Amendment-protected medical debate on a matter of public importance. James' actions also run afoul of the Second Circuit's teaching in *Evergreen*

*Association, Inc. v. City of New York*, 740 F.3d 233, 239 (2d Cir. 2014), which stands for the proposition that government may not force pro-life PHOs like the Plaintiffs here to parrot government propaganda favoring abortion (including chemical abortion) and disfavoring APR, nor force them to declare in the manner the government demands that they oppose abortion and will not provide or refer for abortion (including chemical abortion).

99.   Her amateur-hour litigation campaign is also the rankest form of viewpoint discrimination and retaliation against organizations she openly (and ignorantly) declares to be "fake clinics"—in blatant violation of "the heart of the First Amendment's Free Speech Clause." *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 1326 (2024). It is true that a "government official can share her views freely and criticize particular beliefs …. What she cannot do, however, is use the power of the State to punish or suppress disfavored expression"—an all-too-common occurrence today. *Id*

100.   James' "lawfare" against similarly situated PHOs is intended to chill, and does chill, Plaintiffs' speech and expressive conduct as faith-based pro-life organizations, including speech and conduct involving the provision of APR to women who exercise their right to change their minds about abortion.

101.   James' lawfare against similarly situated PHOs involves unconstitutional and overbroad misapplication of business laws to religiously motivated non-profit organizations engaging in protected speech and expressive activity James disfavors and seeks to suppress.

102.   Additionally, James' threat to further intrude into the affairs of similarly situated PHOs, if carried out and if and when extended to Plaintiffs, will chill and censor Plaintiffs' protected speech regarding alternatives to abortion and Plaintiffs' right of expressive association.

103.  In the absence of injunctive relief, James will continue to cause Plaintiffs ongoing and irreparable harm via the chill that her viewpoint-discriminatory, unwarranted, and retaliatory intrusion into similarly situated pro-life organizations' APR speech has caused for Plaintiffs.

104.  Plaintiffs are thus entitled to a declaratory judgment that James' ongoing and imminent *in terrorem* litigation campaign based on their protected speech violates the First Amendment and to temporary, preliminary, and final injunctive relief to prevent her from bringing a similarly meritless suit against them.

105.  Plaintiffs are further entitled to an award of costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**
(Violation of the First Amendment to the United States Constitution –
Free Exercise of Religion)

106.  The preceding allegations are incorporated here by reference.

107.  The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

108.  James' baseless and intrusive state court suit against similarly situated New York-based pro-life organizations for "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper" is intended to harass and intimidate Plaintiffs and all other similarly situated organizations from communicating similar APR speech as part of their Christian pro-life mission, which is motivated by the sincere religious conviction that all human life is made in the image and likeness of God, including life in the womb, is therefore sacred, and must be protected.

109.  James' state court lawfare is intended to chill, does chill, and will chill, Plaintiffs' free exercise of religion as faith-based organizations because her state-court case demonstrates that the truthfulness and accuracy of communications supporting APR are not safeguards against selective, vexatious, and financially ruinous prosecution under facially inapplicable statutes.

110.  The legal and financial consequences of running afoul of James' anti-APR ire easily constitute a substantial burden on Plaintiffs' religious exercise.

111.  At the same time, James' all-out retaliatory attack on so-called "fake clinics" like Plaintiffs reeks of the sort of anti-religious targeting so often condemned by the Supreme Court. Indeed, the Free Exercise Clause bars impish politicians like James from enforcing laws in a manner "hostile to the religious beliefs of affected citizens" or "that passes judgment upon or presupposes the illegitimacy of religious practices." *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018). This is true even where clever government actors engage in more "subtle departures from neutrality." *Id.* Here, James' anti-pro-life crusade is anything but subtle. But, at minimum, it at least gives rise to the "slight suspicion" of "animosity" toward pro-life religious beliefs "or distrust of" their attendant practices that triggers strict scrutiny under the First Amendment. *Id.* at 638-39. And the notion that James' arbitrary and anti-science "legal" attack could satisfy such scrutiny here is utterly laughable.

112.  Further, the Free Exercise Clause prohibits government actors from substantially burdening religious exercise while leaving unburdened other activities that undermine asserted government interests in comparable ways, at least without satisfying strict scrutiny. *See, e.g.*, *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Here, James has honed her application of New York anti-business deception laws against religiously motivated, scientifically accurate, and entirely non-commercial pro-life speech regarding APR by pro-life pregnancy centers, while leaving

undisturbed, for example, PPNY's blatantly false, non-religious, and openly profit-motivated speech about APR and chemical abortion. That is exactly the kind of arbitrary and substantial burden on religiously motivated activity that violates the First Amendment's Free Exercise Clause. *See, e.g.*, *Soos v. Cuomo*, 470 F. Supp. 3d 268 (N.D.N.Y. 2020).

113.  In the absence of injunctive relief, James will continue to cause Plaintiffs ongoing and irreparable harm by way of the chill her viewpoint-discriminatory, unwarranted, and retaliatory intrusion into similarly situated pro-life organizations' religiously motivated APR speech has caused for Plaintiffs.

114.  Plaintiffs are thus entitled to a declaratory judgment that James' ongoing *in terrorem* litigation campaign violates the First Amendment and to temporary, preliminary, and final injunctive relief to prevent her from bringing a similarly meritless suit against them on account of substantively similar statements about APR motivated by their religious belief.

115.  Plaintiffs are further entitled to an award of costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

### THIRD CAUSE OF ACTION
(Violation of the Fourteenth Amendment to the United States Constitution –
Due Process)

116.  The preceding allegations are incorporated here.

117.  The Fourteenth Amendment provides, in part, "No State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV.

118.  Any vague statute "must be condemned as repugnant" to the Constitution, but a statute that vaguely penalizes speech is especially odious because it enables a government to arbitrarily stifle messages it disfavors. *Lanzetta v. New Jersey*, 306 U.S. 451, 458 (1939).

119.  Especially after some Southern states abused vague speech restrictions as a weapon

against civil rights leaders during the 1960s, the Supreme Court consistently has emphasized that statutory speech restrictions must be written with a "greater degree of specificity than in other contexts" even if they only collaterally affect speech. *Smith v. Goguen*, 415 U.S. 566, 573 & n.10 (1974). Otherwise, speech that local politicians disfavor will not have "breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 432–33 (1963).

120.   When a statute gives unfettered discretion to prosecutors and police who might apply its vague prohibition unevenly or even discriminatorily, it violates the Constitution in an especially dystopian way. *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018).

121.   James' enforcement of the commercial fraud provisions of GBL §§ 349 and 350 against pro-life organizations for their noncommercial, truthful speech about APR leans into the statutory vagueness to selectively prosecute organizations that could not have had fair notice of what speech the statute prohibits given that no court in New York has *ever* understood either section to apply to a not-for-profit's noncommercial speech.

### JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

### PRAYER FOR RELIEF

Plaintiffs respectfully pray for judgment against Defendant James and request the following relief:

A.   A preliminary and permanent injunction barring Defendant James and any other person acting on her behalf from enforcing Section 349 or Section 350 of the New York General Business Law or Section 63(12) of the New York Executive Law against any Plaintiff in relation to its communications about APR.

B.    A declaratory judgment that Sections 349 and 350 of the New York General Business Law and Section 63(12) of the New York Executive Law are unconstitutional under the First and Fourteenth Amendments to the United States Constitution as applied to restrict, hamper, or impede Plaintiffs' APR speech.

F.    An award of costs and attorney fees pursuant to 42 U.S.C. § 1988.

G.    Such other relief as this Court may deem just and proper.

THOMAS MORE SOCIETY

_____

Christopher A. Ferrara, Senior Counsel
Dennis Ring, Special Counsel
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
docketing@thomasmoresociety.org
*Counsel for Plaintiffs*

Peter Breen[†]
Joan M. Mannix [†]
Michael G. McHale [†*]
B. Tyler Brooks [†**]
Christopher J.F. Galiardo [†***]
309 W. Washington St., Ste. 1250
Chicago, Illinois 60606
(312) 782-1680
*Counsel for Plaintiffs*

† *pro hac vice forthcoming.*

†* *pro hac vice forthcoming*; admitted in Nebraska.

†** *pro hac vice forthcoming*; admitted in North Carolina, South Carolina, Tennessee, and Michigan.

†*** *pro hac vice forthcoming*; admitted in Texas.

**VERIFICATION OF COMPLAINT**

I, _James Hanch_, a citizen of the United States and a resident of _Webster_, New York, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and further declare that all facts are true and correct.

Executed this 30 th day of July, 2024, at _Rochester_, New York.

_____
[[NAME]]

31

## **VERIFICATION**

I, a medical doctor who am board certified in obstetrics and gynecology, am a Fellow of the American College of Obstetrics and Gynecology, and supervise medical policy and protocol for all patients seen through Plaintiff Evergreen, affirm this 1st day of August 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the information contained in paragraphs 56-61, 65-69, and 73 is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dr. Katherine S. Lammers (Aug 6, 2024 23:45 EDT)

_____

Dr. Katherine Lammers, MD, FACOG

**VERIFICATION OF COMPLAINT**

I, <u>Barbara Bidak</u>, a citizen of the United States and a resident of <u>Lockport</u>, New York, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and further declare that all facts are true and correct.

Executed this <u>25</u> th day of July, 2024, at <u>Niagara Falls</u>, New York.

*Barbara Bidak*, Executive Director

[[NAME]]

# EXHIBIT A

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
HEALTH CARE BUREAU

## NOTICE OF PROPOSED LITIGATION PURSUANT TO
## NEW YORK EXECUTIVE LAW § 63(12) AND
## ARTICLE 22-A OF THE NEW YORK GENERAL BUSINESS LAW

April 22, 2024

### BY CERTIFIED MAIL

Alternative Crisis Pregnancy Center, Inc.
Attn: Executive Director
226 Church Street
Poughkeepsie, NY 12601

Alternative Crisis Pregnancy Center, Inc.
Attn: Executive Director
PO Box 2118
Poughkeepsie, NY 12601

### Notice of Intention to Sue

To Whom It May Concern,

Please be advised that the New York State Office of the Attorney General intends to commence litigation against Alternative Crisis Pregnancy Center, Inc. d/b/a Care Net Pregnancy Center of the Hudson Valley ("Care Net Pregnancy Center of the Hudson Valley"), on behalf of the People of the State of New York, pursuant to New York Executive Law § 63(12) and New York General Business Law Article 22-A, §§ 349, 350, in light of Care Net Pregnancy Center of the Hudson Valley's repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ("APR") protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol. The Attorney General intends to seek injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper.

PLEASE TAKE NOTICE THAT, under General Business Law §§ 349(c) and 350-c, you are hereby afforded the opportunity to show, orally or in writing, within five (5) business days of receipt of this notice, why such proceeding should not be commenced.

Sincerely,

 /s/    Eve Woodin
Eve Woodin, Assistant Attorney General
Health Care Bureau
Eve.Woodin@ag.ny.gov | (212) 416-6389

Louisa Irving, Assistant Attorney General
Civil Rights Bureau
Louisa.Irving1@ag.ny.gov | (212) 416-8534

State of New York Office of the Attorney General
28 Liberty Street, New York, NY 10005

State of New York
Office of the Attorney General
28 Liberty Street
New York, NY 10005

CIVIL RIGHTS BUREAU

CERTIFIED MAIL®

9589 0710 5270 1401 6422 85

FIRST-CLASS

US POSTAGE AND PITNEY BOWES

ZIP 10005
02 7W
0000827941 APR 22 2024

$ 008.69⁰

Care Net Pregnancy Center of the Hudson Valley
Attn: Executive Director
226 Church Street
Poughkeepsie, NY 12601

12601~426425

7/23/24, 11:46 AM
Case 1:24-cv-00741-JLS Document 1 Filed 08/07/24 Page 37 of 38
case series NOT clinical trial NOT trial Journal articles (American Journal of Obstetrics and Gynecology) Cont…


ScienceDirect®

**EXHIBIT B**

Find articles with these terms

"case series" NOT "clinical trial" NOT "trial"

Journal or book title: American Journal of Obstetrics and Gynecology ✕  Year: 2000-2024 ✕

⌄ Advanced search

---

184 results                                                    *relevance* | date

☐ **Research article** ● Full text access
1  Safety of ovarian cryopreservation and transplantation in patients with acute leukemia: a
   case series
   American Journal of Obstetrics and Gynecology, January 2024
   Murat Sönmezer, Yavuz Emre Şükür, … Kutluk H. Oktay
   📄 View PDF    Abstract ⌄    Figures ⌄    Export ⌄

☐ **Research article** ● Full text access
2  New-onset myocardial injury in pregnant patients with coronavirus disease 2019: a case
   series of 15 patients
   American Journal of Obstetrics and Gynecology, April 2021
   Brisandy Ruiz Mercedes, Ayna Serwat, … Lina Karout
   📄 View PDF    Abstract ⌄    Export ⌄

☐ **Research article** ● Open access
3  Prevalence, risk factors, and outcome of postprocedural amniotic band disruption
   sequence after fetoscopic laser surgery in twin-twin transfusion syndrome: a large single-
   center case series
   American Journal of Obstetrics and Gynecology, October 2020
   Patricia J. C. Knijnenburg, Femke Slaghekke, … Enrico Lopriore
   📄 View PDF    Abstract ⌄    Figures ⌄    Export ⌄

☐ **Research article** ● Full text access
4  Complications of central venous catheters during pregnancy and postpartum: a case series
   American Journal of Obstetrics and Gynecology, September 2009
   Francis S. Nuthalapaty, Mary M. Beck, William C. Mabie
   📄 View PDF    Abstract ⌄    Export ⌄

☐ **Research article** ● Full text access

💬 FEEDBACK

7/23/24, 11:49 AM

Case 1:24-cv-00741-JLS Document 1 Filed 06/07/24 Page 38 of 38
Keywords: "case series" NOT "clinical trial" NOT "trial" - European Journal of Obstetrics & Gynecology and Rep…



ScienceDirect

Find articles with these terms

"case series" NOT "clinical trial" NOT "trial"    🔍

Journal or book title: European Journal of Obstetrics & Gynecology and Reproductive Biology  ✕    Year: 2000-2024  ✕

⌄ Advanced search

---

174 results                                                              *relevance* | date

☐  Research article  ● Full text access
1   Case series on the management and outcomes of Bartholin gland carcinoma

European Journal of Obstetrics & Gynecology and Reproductive Biology, August 2024

Salamatu Abdul-Aziz, Aarthi S. Jayraj, … Anupama Rajan Babu

📄 View PDF    Abstract ⌄    Figures ⌄    Export ⌄

☐  Research article  ● Full text access
2   Laparoscopic subtotal hysterectomy followed by in-bag transvaginal corpus uteri
    morcellation and extraction: A case series

European Journal of Obstetrics & Gynecology and Reproductive Biology, March 2023

Jvan Casarin, Fabio Ghezzi, … Antonella Cromi

📄 View PDF    Abstract ⌄    Figures ⌄    Export ⌄

☐  Research article  ● Full text access
3   Self-esteem, depression, anxiety and sexual function in Mayer-Rokitansky-Küster-Hauser
    syndrome with neovagina: A case series

European Journal of Obstetrics & Gynecology and Reproductive Biology, July 2024

Xiao-hong Lei, Xiao Wang, … Ying Zhang

📄 View PDF    Abstract ⌄    Figures ⌄    Export ⌄

☐  Research article  ● Full text access
4   Medical Management of Uterine Arteriovenous Malformation: A Case Series

European Journal of Obstetrics & Gynecology and Reproductive Biology, July 2022

Ruth Habte, Ali Yosef, Mohamed Bedaiwy

📄 View PDF    Abstract ⌄    Figures ⌄    Export ⌄

☐  Research article  ● Full text access
5   A novel obstetrical surgical intervention – New episiotomy: Case series study

European Journal of Obstetrics & Gynecology and Reproductive Biology, March 2023

💬 FEEDBACK